[Civ. No. 23225.   Second Dist., Div. Three.   May 6, 1959.]

ARTHUR CARTER et al., Respondents, v. LEWIS
MILESTONE, Appellant.

Gang, Kopp & Tyre, Martin Gang and Payson Wolff for Appellant.

Rosenthal & Norton and Robert G. Rifkind for Respondents.

SHINN, P. J.—This action was brought by Arthur Carter and Jed Harris against Lewis Milestone, the complaint alleging that a controversy existed between the plaintiffs and defendant whether defendant had any contract rights in connection with the writing and production of a screen play, its release, distribution and exploitation and praying judgment that the defendant had no such rights. Certain incidental

relief was sought. Defendant answered claiming an interest in the play as a partner or joint adventurer and cross-complained seeking recovery of $35,000 for services rendered and $1,862.85 for moneys expended in connection with the enterprise.

The principal contention of the plaintiffs was that although they had entered into a written agreement with the defendant with respect to the writing and production of a screen play the agreement was incomplete in material particulars and was, and was understood to be, in effect, no more than an expression of the intention of the parties to enter into a contract in the future which would express their full understanding and agreement. The findings sustained this contention, and it was decreed that defendant had no rights whatever in the screen play or its production. Defendant was awarded on his cross-complaint $500 against plaintiff Carter for sums advanced and $298.80 against Harris and Carter for sums expended and plaintiffs were awarded their costs of suit. Defendant appeals.

The transcript of the oral proceedings comprises some 600 pages of testimony but there is no substantial dispute as to any of the material facts upon which the court concluded that the parties did not understand or intend the writing to constitute a binding agreement.

Carter is a resident of Rhode Island and the author of an unproduced stage play entitled ''Operation Mad Ball''; Harris, a resident of New York, is a producer and director of stage plays and motion pictures; Milestone, a resident of California, is a director of motion pictures. Between June 1955 and February 1956, Harris and Carter discussed the production of a motion picture based upon the play. In February 1956, upon the invitation of Harris, Milestone visited him in New York and read the play. These two with Carter had conferences during the ensuing two weeks and discussed forming a company to produce a picture. Upon the request of Harris, a New York attorney, Arnold Krakower, made a draft setting forth the preliminary ideas upon which a contract might thereafter be worked out and he presented to the three men option agreements under which Harris and Milestone would have a right to buy the screen play, but these were rejected; Carter wished to have an interest in the production, which he would not have had under the proposed options. Shortly thereafter the parties signed a letter drafted

by Krakower. This is reproduced in the margin.[1]   Carter worked on the screen play and in April 1956 he and Harris came to California where Carter finished writing it.

The court found that before the agreement was signed Krakower told each of them that it was not a binding contract and gave rise to no legal rights, and that the parties each anticipated that a formal lengthy contract was to be negotiated in the future; they did not intend the signed document to be binding but intended it to be nothing more than a statement of intention upon which they would later

---

[1]"Mr. Jed Harris                                            March 16, 1956
    Mr. Lewis Milestone
    42 East 73rd Street
    New York, N. Y.

"Reference: OPERATION MAD BALL by Arthur Carter

"Dear Mr. Harris and Mr. Milestone:

"The signatures of the parties below will indicate that this is the general understanding under which formal contracts will be prepared.

"1. A company, which will undertake to produce the motion picture, is to be set up with Jed Harris, Lewis Milestone and Arthur Carter as equal partners.

"2. Arthur Carter is to receive $35,000 for both rights to his play and to the screenplay now being written. This $35,000 to be deferred. Mr. Harris and Mr. Milestone are to receive $50,000 each also to be deferred. The contract will, of course, detail the meaning of deferred, etc.

"3. The producing company is to have an option on the screen rights to the play for a period of four months from May 1, 1956, it being understood that a screenplay be completed and that the producing company will have made bona fide financing or distributing contracts which will insure the production of the motion picture by May 1, 1957.

"4. Arthur Carter is to be paid $1,000 on signing of the option agreement which is to cover his expenses for a period of four weeks beginning March 10, 1956, during which time he will be writing the screenplay. This period may be extended one additional week immediately following the four weeks for an additional payment of $250. If he is needed and available, Mr. Carter will contribute additional time and services during the making of the picture and the producers agree to pay his transportation and living expenses during such period or periods.

"5. This contract is to involve the making of one picture only, no remakes, no sequels.

"6. The parties agree that the form of formal contract to be entered into will be the standard form of motion picture production contract and shall contain all of the rights usually contained therein, including, but not being limited to, television and radio rights.

"7. In the event that the picture is not made by this company in the stipulated period of time, then any and all rights to the play and the screenplay must revert to Arthur Carter in order to keep his title free and clear. He will agree, however, that in regard to the screenplay alone, he should get the first $35,000 and the next $35,000 should be divided equally between Mr. Harris and Mr. Milestone.

                                            Very truly yours,
                                            /s/  ARTHUR P. CARTER
UNDERSTOOD AND APPROVED:
/s/  JED HARRIS          /s/  LEWIS MILESTONE"

try to work out a contract if a screen play was written by Carter in collaboration with Harris.

It is, of course, elementary that a writing which is intended by the parties to be a mere memorandum of intention to negotiate a contract and which does not purport to state the essentials of a proposed agreement is unenforceable. (*Dillingham* v. *Dahlgren,* 52 Cal.App. 322 [198 P. 832].)

Whether the writing which is before us should be construed as a complete agreement or only as a memorandum which left essentials to future negotiations was to be decided in accordance with the ascertained intentions of the parties. (17 C.J.S. 391-392; 12 Cal.Jur. 246-247; 122 A.L.R. 1232-1237; 165 A.L.R. 759-761.)

Whether the parties intended the writing to be presently effective or a mere memorandum of an intention to enter into an agreement to be prepared at a future date was a question of fact. The proof that they did not intend the writing to constitute their complete agreement could consist of evidence of an express agreement to that effect, or the fact could be inferred from manifest incompleteness of the writing itself. In the present case the finding has support in both forms of proof. With respect to the proof of an express agreement we do not have a question of the efficacy of an express agreement of the noneffectiveness of a writing which contains all the essentials of a completed contract in accordance with the intentions of the parties, but, rather, evidence of an understanding of the parties of the noneffectiveness of a writing which the court could and did reasonably conclude was incomplete and left essentials to further negotiation. The testimony in the case related almost exclusively to discussions of the plans of the parties and their understanding of the purpose and effect of the writing which they signed. Our discussion of that evidence will be brief. In his briefs appellant does not question the sufficiency of the evidence to support the finding that the parties did not intend the writing to be a complete or binding agreement and that they contemplated further negotiations. He says only: ''Plaintiffs' Exhibit 1 [the March 16, 1956 writing] and the oral agreement of the parties constitute a valid contract.'' The finding as to the understanding and intentions of the parties, if justified by the evidence, is sufficient to support the judgment. Mr. Krakower testified with respect to the preparation of two formal contracts and their rejection by

the parties; they had not reached agreement upon essential features; they wished only a memorandum of what they were planning to do; he prepared the letter and explained to them that it gave rise to no legal rights but might serve as an "aid to memoir." Appellant does not make a statement of any of the evidence relative to the finding that the parties did not intend the writing to be binding upon them and understood a completed agreement would be subject to future negotiation. In the absence of an attack upon that finding, supported by a fair statement of the relevant evidence, with transcript references, we would be warranted in affirming the judgment upon that ground alone. (*Hickson* v. *Thielman*, 147 Cal.App.2d 11 [304 P.2d 122].)

Nevertheless we have read the record and find that in addition to the testimony of Mr. Krakower there was ample evidence in the testimony of Carter, of Harris and of Milestone that the parties had no intention of entering into a full and binding agreement unless and until they succeeded in negotiating with a major studio for the production of the screen play upon terms that were satisfactory to them. The reasons for this will be made clear from a consideration of the writing itself, coupled with the fact that the parties had no intention of making use of their own resources for the production of the screen play.

It is contended by appellant that the finding as to the intentions of the parties would likely have been different had not the court sustained objections to certain questions asked of Carter on cross-examination. He was asked whether he had told his literary agent, Helen Harvey, to have inserted in the letter agreement the substance of the first numbered paragraph thereof and whether he told her he was going to sign the instrument. Objections to these questions were sustained. Carter had signed the agreement and was familiar with its contents. A letter written by Helen Harvey to Harris stated that Carter wished to have in the tentative agreement the substance of paragraph 1. Under these circumstances evidence of any discussion between Carter and his agent with respect to the inclusion of paragraph 1 in the letter agreement was properly excluded as immaterial. Also properly sustained was an objection to the question asked Carter as to the circumstances under which he received some documents from Mr. Krakower's office.

We turn now to the writing of March 16th. The court found that in numerous particulars it failed to state the terms

of a completed agreement and that in those particulars there had been no meeting of the minds. This conclusion of the court is manifestly correct. Not only does the conclusion fortify the finding that the parties did not intend the writing they signed to be binding upon them but it constitutes in our opinion a correct conclusion that the incompleteness of the writing is shown upon its face.

The company which the parties were to form was to have four months from May 1, 1956, in which to acquire rights in the play and to produce financing and production contracts. Paragraph 3 reads in part: ". . . it being understood that a screen play be completed and that the producing company will have made bona fide financing or distributing contracts which will insure the production of the motion picture by May 1, 1957." This would call for a mutual agreement of the parties as to what would be bona fide financing or distributing contracts. Such contracts would have to be satisfactory to all the parties. Milestone testified that this provision related to the subject matter of paragraph 6 which reads: "The parties agree that the form of formal contract to be entered into will be the standard form of motion picture production contract and shall contain all of the rights usually contained therein, including, but not being limited to, television and radio rights."

The court found: "There is no such thing as a standard form of motion picture production contract. Such contracts generally run from seventy to ninety pages and each of the terms of such contracts can and do vary." This finding was based upon the testimony of Milestone that there is no standard form of production contract; each one is subject to negotiation; they vary in every important particular, depending upon the expected cost, the supposed value of the production, the actors and numerous other factors, and the percentage of interest in the production which is demanded for use of studio facilities and financing, which may run as high as 50 per cent.

Appellant says in his opening brief: "In the within action, it is clear that the open terms were not only non-essential to the existence of a binding agreement, but also they were of a nature which had to be left to abide the conclusion of a production-release agreement with a major studio. This is the type of agreement that the parties contemplated would require 70 to 80 pages. In such an agreement the terms would be spelled out as to how much cash the major studio or financing agent would advance, and accordingly make funds available to the parties to enable them to schedule the payment of their deferments, for

example.'' This is a frank statement, but contradictory. After stating that the ''open terms'' were nonessential it proceeds to show that the omitted terms were of the very essence of the agreement which the parties hoped to make. With respect to exercise of the option upon which depended the provisions for sums of $35,000 to be paid Carter and $50,000 each to Harris and Milestone mentioned in paragraph 2 of the writing, which were to be deferred, Milestone testified that exercise of the option would be contingent upon the negotiation of a contract with a major studio which it was hoped would advance the needed financing.

The entire project was dependent upon the negotiation of contracts with a major studio or distributing agency for financing and production of the screen play. There was no agreement, oral or written, nor was there even any discussion of the terms of such hoped for contracts that would be acceptable. If satisfactory contracts were not negotiated there would be no production of the screen play accomplished by the parties and no money to be divided; the project would fail. No such contracts were negotiated and the project did fail.

Under the provisions of paragraph 7 all rights in the screen play reverted to Carter. There is a provision reading: ''He will agree, however, that in regard to the screenplay alone, he should get the first $35,000 and the next $35,000 should be divided equally between Mr. Harris and Mr. Milestone.'' The parties do not discuss the significance of this provision. Milestone testified that it meant that Carter could sell the screen play and if he did the first $70,000 was to be divided one-half to him and one-half to Harris and Milestone. Instead of relying upon this provision Milestone sued for $35,000 as the value of the services rendered to plaintiffs. The court found that he had rendered no services and this finding is not questioned. The provision we have quoted is not one which created any enforceable rights in Milestone. We do not have a contract which is legal in some particulars and illegal in others, nor one which for other reasons is in part valid and in part invalid. No question of severability is involved. We have only a writing which is no contract at all. It created no rights in Milestone as a partner or joint adventurer nor any other rights in the screen play or its production except in a contingency which never arose.

As we have seen, this appeal brings in question, except in minor particulars, only the sufficiency of the evidence to sus-

tain the findings upon the controlling factual issues. The rules of law applicable to those facts are simple and clear. It would serve no good purpose to discuss the authorities relied upon by the appellant with respect to the sufficiency of the agreements construed in those cases since the facts in the cited cases bear no similarity to those of the instant case.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.